UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT PIERCE DIVISION

CASE NO. 21-14197-CIV-CANNON/Maynard

**NORTH AMERICAN COMPANY
FOR LIFE AND HEALTH INSURANCE**,

    Plaintiff,
v.

**MICHELLE CALDWELL**
and **MICHAEL J. HARNER**,
the latter in his capacity as trustee for
**THE IRREVOCABLE LIFE INSURANCE
TRUST OF JUSTIN W. CALDWELL**,

    Defendants.
_____/

**ORDER GRANTING DEFENDANTS'
MOTION FOR JUDGMENT ON THE PLEADINGS**

**THIS CAUSE** comes before the Court upon Defendants' Motion for Judgment on the Pleadings ("Motion") [ECF No. 29]. The Court has considered the Motion, Plaintiff's Response in Opposition [ECF No. 34], Defendants' Reply [ECF No. 39], the full record, and is otherwise fully advised. Following careful review, Defendants' Motion [ECF No. 29] is **GRANTED**.

BACKGROUND

This is an action seeking a declaratory judgment that no benefits are payable under two insurance contracts after the insured died from an armed standoff with police. The following facts are drawn from the Plaintiff's Complaint, filed on May 7, 2021 [ECF No. 1]. All material facts alleged in the Complaint are accepted as true and must be viewed in the light most favorable to the non-moving party. *Perez v. Wells Fargo N.A.*, 774 F.3d 1329, 1335 (11th Cir. 2014).

A. **The Insurance Policies**

Plaintiff, North American Company for Life and Health Insurance ("Plaintiff"), issued two life insurance policies to Justin Caldwell (deceased) [ECF No. 1 ¶ 1].

The first policy, issued on November 9, 2018 ("Policy '244"), named Defendant, the Irrevocable Life Insurance Trust of Justin W. Caldwell (the "Insurance Trust"), as the owner and primary beneficiary [ECF No. 1 ¶ 2]. Defendant, Michael J. Harner, is the trustee of the Insurance Trust [ECF No. 1 ¶ 2]. Policy '244 provided a $1 million death benefit, if payable, to the beneficiary of the Policy [ECF No. 1 ¶ 2].

The second policy was issued on April 27, 2020, and names Defendant, Michelle Caldwell (Justin's wife), as the owner and primary beneficiary [ECF No. 1 ¶ 3]. Policy '472 provides a $1 million death benefit, if payable, to the beneficiary of the Policy [ECF No. 1 ¶ 5].

Both Policy '244 and Policy '472 include clauses providing that no benefits are payable if the insured commits "suicide" [ECF No. 1 ¶ 7]. Specifically, Section 3.4 of Policy '244 states:

> SUIDICE – If the Insured commits suicide, while sane or insane, within two years from the Policy Date, Our liability is limited to an amount equal to the total premiums paid. We will pay this amount to the Beneficiary in one sum.

[ECF No. 1-4, p. 11]. Similarly, Section 3.4 of Policy '472 states:

> If the Insured commits suicide, while sane or insane, within two years from the Policy Date, Our liability is limited to an amount equal to the total premiums paid, less any Policy Debt and Withdrawal amount. The Withdrawal amount includes Withdrawal Charges and Withdrawal Processing Fees applied at the time of the Withdrawal. We will pay this amount to the Beneficiary in one lump sum. See Section 6.12: Withdrawals and Section 6.13: Withdrawal Charge for details on Withdrawal Charges and Withdrawal Processing Fees.
>
> If the Insured commits suicide, while sane or insane, within two years from the effective date of any increase in the Specified Amount, Our liability with respect to such increase is limited to the Cost of Insurance charged for such increase.

[ECF No. 1-5, p. 20].

### B. Justin Caldwell's Death

On October 8, 2020, the Martin County Sheriff Office dispatched personnel to the Caldwell residence after receiving a 911 call from Michelle, who stated that Justin was "armed and dangerous" and "suicidal" [ECF No. 1 ¶¶ 13, 15]. Upon the officers' arrival, Michelle explained that Justin was upset because she told him that she wanted a divorce, and that afterwards he went into the garage to load "multiple types of firearms" [ECF No. 1 ¶ 15]. SWAT team personnel tried to persuade Justin to surrender peacefully, but Justin began "swearing at [the SWAT team members], and, turning around, he started to run back to the truck" [ECF No. 1 ¶¶ 16–17]. The SWAT team fired non-lethal rounds at Justin to prevent him from obtaining his gun, but Justin reached into his truck, "grabbed the rifle, spun around, and lifted the rifle to shoot the deputies" [ECF No. 1 ¶ 17]. Justin was shot and killed by the SWAT team [ECF No. 1 ¶ 18].

On November 4, 2020, Defendants filed a claim to receive the $2 million in benefits under Policies '244 and '472 [ECF No. 1 ¶ 26]. Plaintiff denied the claim based on its conclusion that "no benefits are payable under the Policies (other than the refund of premiums paid for coverage) in light of suicide clauses in the Policies" [ECF No. 1 ¶ 24]. Specifically, Plaintiff relies on the theory that Justin committed "suicide through the instrumentality of 'suicide by cop,'" triggering the exclusionary clauses contained in both Policies [ECF No. 1 ¶ 24].

On May 7, 2021, Plaintiff filed a complaint seeking a judicial declaration from this Court that "the $2 million cumulative death benefits under the Policies are not payable because Justin committed suicide" [ECF No. 1 ¶ 30]. Thereafter, on June 16, 2021, Defendants filed a Joint Answer, Affirmative Defense and Counterclaim [ECF No. 10], asserting a single cause of action against Plaintiff for breach of contract, alleging that, because Justin did not take his own life,

Plaintiff has therefore "breached the contracts by refusing [to] pay the death benefits to the named beneficiaries" [ECF No. 10 ¶¶ 47–54].

On October 11, 2021, Defendants filed the instant Motion pursuant to Federal Rule of Civil Procedure 12(c) [ECF No. 29]. The Motion is ripe for adjudication.

## LEGAL STANDARDS

### A. Rule 12(c) Motion for Judgment on the Pleadings

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "Judgment on the pleadings is appropriate where there are no material facts in dispute and the moving party is entitled to judgment as a matter of law." *Cannon v. City of W. Palm Beach*, 250 F.3d 1299, 1301 (11th Cir. 2001). "A motion for judgment on the pleadings is governed by the same standard as a Rule 12(b)(6) motion to dismiss." *Guarino v. Wyeth LLC*, 823 F. Supp. 2d 1289, 1291 (M.D. Fla. 2011) (citing *Hawthorne v. Mac Adjustment, Inc.*, 140 F.3d 1367, 1370 (11th Cir. 1998)). All material facts alleged in the non-moving party's pleading are accepted as true and must be viewed in the light most favorable to the non-moving party. *Perez*, 774 F.3d at 1335. Additionally, the Court may consider documents attached to a Rule 12(c) motion so long as "the documents are (1) central to the [plaintiff's] claim and (2) their authenticity is not challenged." *Ramey v. Interstate Fire & Cas. Co.*, 32 F. Supp. 3d 1199, 1203 (S.D. Fla. 2013) (citing *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005)).

### B. Interpretation of Insurance Policies Under Florida Law

Under Florida law,[1] insurance contracts must be construed according to their plain meaning. *See Garcia v. Fed. Ins. Co.*, 969 So. 2d 288, 291 (Fla. 2007). A policy is not ambiguous

---

[1] The parties agree that Florida substantive law applies to the Policies in dispute. This case implicates the Court's diversity jurisdiction, and the Policies were issued in Florida to a Florida insured. *See Travelers Indem. Co. v. PCR Inc.*, 326 F.3d 1190, 1193 (11th Cir. 2003), *certified*

4

simply because it is complex or requires analysis. *See Southern-Owners Insurance Company v. Easdon Rhodes & Associates LLC*, 872 F.3d 1161, 1164 (11th Cir. 2017). If an insurance policy provision is clear and unambiguous, the provision should be enforced according to its terms. *See Travelers Indemnity Company of Connecticut v. Richard McKenzie & Sons, Inc.*, 10 F.4th 1255, 1264 (11th Cir. 2021) (quoting *Taurus Holdings, Inc. v. United States Fidelity & Guaranty Co.*, 913 So. 2d 528, 532 (Fla. 2005)).

## DISCUSSION

The question before the Court is whether the term "suicide" as used in the Policies is congruous with the meaning that Plaintiff advances to include instances of "suicide-by-cop," whereby an individual intentionally provokes a lethal response after violently threating law enforcement officers [ECF No. 1 ¶ 35]. Plaintiff asserts that the exclusionary clauses contained in the Policies "appl[y] to Justin's causing his own death by deliberately provoking a SWAT team to shoot and kill him, just as it would apply to his shooting himself" [ECF No. 34, p. 10]. This is so, Plaintiff argues, because suicide can encompass situations where a person who is intent on killing himself causes "innocent third-persons to physically inflict the final blow" [ECF No. 34, p. 10]. Plaintiff does not dispute that the SWAT team shot and killed Justin but maintains that Justin nonetheless achieved his desired end of being killed [ECF No. 34, p. 12].

Defendants take issue with Plaintiff's reliance on the term "suicide by cop," which Defendants argue is not a legal term but rather a term of art that describes a justified homicide—not suicide [ECF No. 29, p. 3]. Defendants contend that Justin's manner of death did not trigger the exclusionary clauses in the Policies, because the "plain meaning of the contract language is

---

*question answered*, 889 So. 2d 779 (Fla. 2004) ("We are required to apply state law when construing insurance policies.").

that Justin had to kill himself in order to void coverage," and instead, the "final act of pulling the trigger was done by others, rendering his death a homicide, not a suicide" [ECF No. 29, p. 5].

Upon review of the language of the Policies and the applicable law, the Court concludes that Defendant is entitled to judgment as a matter of law.[2] Based on the plain terms of the Policies and the undisputed fact that SWAT team officers shot and killed Justin on October 8, 2020, Justin did not commit "suicide," and hence the "suicide" exclusion in the Policies does not apply to preclude coverage.

Although neither Policy '244 or '472 defines the term "suicide," the lack of a definition does not render the term ambiguous. *See Key v. Allstate Ins. Co.*, 90 F.3d 1546, 1549 (11th Cir. 2003). Instead, undefined "terms must be given their everyday meaning and should be read with regards to ordinary people's skill and experience." *Miglino v. Universal Prop. & Cas. Ins. Co.*, 174 So. 3d 479, 481 (Fla. Dist. Ct. App. 2015) (quoting *Harrington v. Citizens Prop. Ins. Corp.*, 54 So. 3d 999, 1003 (Fla. Dist. Ct. App. 2010)). Policy terms should be given their "plain and unambiguous meaning as understood by the 'man-on-the-street.'" *State Farm Fire & Cas. Co. v. Castillo*, 829 So. 2d 242, 244 (Fla. Dist. Ct. App. 2002). In undertaking this review, "Florida courts will often use legal and non-legal dictionaries to ascertain the plain meaning of words that appear in insurance policies." *Migliano*, 174 So. 3d at 481.

The plain meaning of the term "suicide" encompasses the act of killing oneself—not the killing of a person by another. Dictionaries consistently define suicide in this way. For example, Black's Law Dictionary defines "suicide" as "the act of taking one's own life," further describing it as "self-killing; self-destruction; self-slaughter; self-murder; felony-de-se; death by one's own

---

[2] In reaching this conclusion, the Court does not rely on the Death Certificate attached to Defendants' Motion [ECF No. 29-1; *see* ECF No. 34, pp. 19–20].

hand." *Suicide*, *Black's Law Dictionary* (11th ed. 2019). Similarly, Merriam-Webster's Collegiate Dictionary defines "suicide" as the "act or an instance of taking one's own life voluntarily and intentionally," especially by "a person of years of discretion and of sound mind." *Suicide*, *Merriam-Webster's Collegiate Dictionary* (11th ed. 2020). Likewise, the American Heritage Dictionary defines "suicide" as "the act or an instance of intentionally killing oneself." *Suicide*, *American Heritage Dictionary of the English Language* (5th ed. 2018).

Notably absent from these definitions are references to acts by third parties that result in a person's death. Those instances can include homicide, which Black's Law Dictionary defines as "[t]he killing of one person by another," *Homicide*, *Black's Law Dictionary* (11th ed. 2019), or "assisted suicide" which refers to "suicide committed by someone with assistance from another person," *Assisted Suicide*, *Merriam-Webster's Collegiate Dictionary* (11th ed. 2020). Although both parties acknowledge that Justin was shot by law enforcement officers, neither party contends that the officers "assisted" Justin as he committed suicide.

Additional authorities reinforce the common-sense notion that "suicide" refers to the death of a party by his own act. In *Bigelow v. Berkshire Life Ins. Co.*, 93 U.S. 284 (1876), for example, a life insurance case concerning a suicide exclusion, the Supreme Court referred to the terms "suicide" and "dying by one's own hand" as synonymous in the insurance context, further describing "suicide" as "self-murder." *Id*. at 286. Florida's criminal code similarly refers to "self-murder" as "the voluntary and intentional taking of one's own life." Fla. Stat § 782.08(1)(a)(b). And Florida courts consistently have distinguished between "self-murder" and "assisted self-murder" to emphasize that the former act occurs when the decedent takes his own life, as opposed to when someone else carries out the fatal act. As a point of reference, in *Ragan v. State*, the Second District Court of Appeals summarized Florida jurisprudence regarding the criminal offense

of assisting self-murder, discussing the Florida Supreme Court's decision in *Patrick v. State,* 117 Fla. 432, 158 So. 101 (Fla. 1934):

> In *Patrick*, the defendant was charged by indictment with first degree murder by shooting the victim, and the court gave a requested jury instruction of assisting self-murder. The [S]upreme [C]ourt found that since the indictment charged the *defendant* with actually shooting the victim, it was error to charge the jury on a theory of assisting self-murder that involved the victim shooting himself with assistance from the defendant. The [S]upreme [C]ourt, therefore, was defining the offense of self-murder as one where the *decedent* fires the fatal shot and is assisted or aided by the defendant. In contrast, in murder, the *defendant*, not the decedent, fires the fatal shot. Since appellant concedes that it is uncontested that he fired the fatal shot, there was no evidence that would have supported giving the assisting self-murder instruction in this case.

599 So. 2d 276, 277 (Fla. Dist. Ct. App. 1992) (emphasis in original and brackets added); *see also See Fister ex rel. Est. of Fister v. Allstate Life Ins. Co.*, 366 Md. 201, 214 (2001) (rejecting the theory of "suicide by cop" and holding that, "when one incites a police officer to use deadly violence, we are either presented with justifiable homicide or simple homicide, "[b]ut under neither circumstance are we presented with suicide, for the death occurred at the hands of another").

Plaintiff cites no authority that would support barring coverage under a "suicide" exclusion based on a theory of "suicide by third party" or "suicide by cop." Plaintiff relies on *Gulf Life Insurance Co. v. Nash*, 97 So. 2d 4 (Fla. 1957), for the proposition that suicide covers any instance in which an insured intends to die, regardless of the manner in which the insured dies [ECF No. 34, p. 7]. Plaintiff overreads *Nash*, which establishes only that an insurer seeking to preclude coverage under a suicide exclusion must prove that an insured acted with an intent to take his own life. In *Nash*, an insured shot and killed himself while playing the equivalent of Russian Roulette with friends. As relevant here, his beneficiary sued for recovery under an ordinary life insurance policy that excluded death "by his own hand or act." The insurance company denied coverage, determining that the decedent "died by his own hand." Following a jury trial, the circuit

court entered judgment in favor of the beneficiary, and the insurer appealed. On appeal, as relevant here, the Florida Supreme Court affirmed the lower court's determination that the insured did not commit suicide. As the court explained, although the insured technically had "died by his own hand or act" when he pulled the trigger that resulted in his death, that phrase "should not be construed literally, but to mean death as a result of an intent on the part of the insured to take his own life." *Id*. at 6. From that reference to suicide requiring an intent to take one's own life—in a case in which the insured undisputedly died as a result of a gunshot fired by himself—Plaintiff draws the broad conclusion that suicide requires only a conscious person's desire to die, "whatever the chosen means" employed to achieve "self-destruction" [ECF No. 34, p. 7, n.1]. *Nash* does not stand for that proposition, nor has any Florida court applied *Nash* in that manner. More broadly, as Plaintiff admits, "no Florida court has had the opportunity to apply *Nash* to suicide by cop, assisted suicide, or another circumstance in which an insured intent on taking her own life does so by enlisting or provoking another person to deliver the fatal blow" [ECF No. 34, p. 10]. Nor do the other authorities cited by Plaintiff support construing the "term" suicide to encompass acts committed by third parties.[3]

---

[3] *See, e.g.*, *Mut. Life Ins. Co. of New York v. Johnson*, 166 So. 442, 447 (Fla. 1935) (finding no error in determination that decedent did not commit suicide, where decedent was found dead in a room with a gunshot wound to the head, with no evidence produced to demonstrate whether he killed himself intentionally); *C.M. Life Ins. Co. v. Ortega Through Ortega*, 562 So. 2d 702, 704 (Fla. Dist. Ct. App. 1990) (reversing district court's ruling that decedent's death was accidental, where decedent pointed a loaded gun to his own head and pulled the trigger); *Charney v. Illinois Mut. Life Cas. Co.*, 764 F.2d 1441, 1442 (11th Cir. 1985) (affirming district court's conclusion that decedent committed suicide by intentionally injecting himself with euthanasia solution); *Staple v. Nw. Mut. Life Ins. Co.*, No. 8:17-CV-3066-T-35TGW, 2020 WL 11272693, at *16 (M.D. Fla. Sept. 30, 2020) (denying summary judgment and leaving for the jury the determination of whether the decedent committed suicide by overdosing on pills); *Travelers Ins. Co. v. Bell*, 188 F.2d 725, 726 (5th Cir. 1951) (affirming judgment that decedent's death was accidental when, "with the gun held in his hand some 8 inches or more from his head," the gun accidentally discharged and killed the decedent).

For these reasons, the Court finds no ambiguity in the term "suicide" as used in Policies '244 and '472. Under the plain language of those Policies, coverage is excluded if the insured voluntarily and intentionally takes his own life. The exclusionary clauses do not encompass instances, as here, where the insured died as a result of being shot by another person. Although the parties dispute Justin's ultimate motivations for violently confronting law enforcement officers, and although the Court accepts Plaintiff's allegation that Justin provoked law enforcement into fatally shooting him, there is no dispute that Justin died as a result of being shot by police officers on October 8, 2020, and hence it cannot reasonably be said that he committed suicide. "If the language is ambiguous, the contract should be construed in favor of the insured; but if it is unambiguous, it must be given effect as written." *Harrington*, 54 So. 3d at 1001–02. Because the Court finds that the Policies are clear and unambiguous, the Court finds no reason not to apply the Policies according to their terms and in favor of Defendants.

## CONCLUSION

Based on the foregoing, it is hereby **ORDERED AND ADJUDGED** as follows:

1. Defendants' Motion [ECF No. 29] is **GRANTED**.

2. The Parties are required to file a Joint Status Report by **January 24, 2022,** explaining the status of this case, what issues, if any, remain to be determined by the Court, and a proposed schedule for resolving any remaining issues.

**DONE AND ORDERED** in Chambers at Fort Pierce, Florida this 18th day of January 2022.

AILEEN M. CANNON
UNITED STATES DISTRICT JUDGE

cc: counsel of record