# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## FORT PIERCE DIVISION

NORTH AMERICAN COMPANY FOR LIFE   :
AND HEALTH INSURANCE,           :
                                  :   Case No. 2:21-CV-14197-AMC
           Plaintiff,          :
                                  :
      vs.                      :
                                  :
MICHELLE CALDWELL and MICHAEL J.   :
HARNER, the latter in his capacity as trustee for  :
THE IRREVOCABLE LIFE INSURANCE   :
TRUST OF JUSTIN W. CALDWELL,     :

           Defendants.

# NORTH AMERICAN'S RESPONSE TO DEFENDANTS' OBJECTIONS TO MAGISTRATE'S REPORT & RECOMMENDATION

## Introduction

The defendants' objections to the Magistrate's *Report & Recommendation* are fundamentally flawed and without merit.

First, contrary to the Supreme Court's trilogy of watershed decisions in *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574 (1986), *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986), and *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986), the defendants repeatedly criticize the Court for discharging its obligation to consider conflicting evidence, inferences, and theories proffered by the defendants *in context*. The Court reviewed the "totality" of the evidence and "record taken as a whole" in concluding that the overwhelming, undisputed evidence that Justin committed suicide was so "one-sided" that no reasonable jury could find otherwise. The Court did not usurp the jury's role by refusing to review the defendants' proffered evidence "in isolation." Instead, the Court simply did its job, as mandated by the Supreme Court.

Second, defendants' objections ignore (quite literally) *all* of the Florida state and federal court precedent cited by North American compelling the Court's conclusion.  In their effort to resist summary judgment, defendants advance fantastical theories and rank speculation that Justin was just acting "in jest" that morning; that Justin's repeated demands for the police to shoot and kill him were just his way of "protesting" against police brutality; and that Justin may have thought he was acting in "self-defense" when he grabbed his rifle and pointed its barrel in the face of the officer who had been called to the scene to protect Justin's wife and children from him.  Contrary  to such "inventive alternative scenarios … bordering on sheer fantasy with no probative force," Justin's death was a suicide because he announced his intent to end his life that morning; he committed multiple (and dangerous) voluntary acts in furtherance of that intent; and his "resultant death" was the direct consequence of the "death-producing agent" he had set in motion. Because the Court properly applied controlling Florida law governing suicide to the undisputed evidentiary facts, its *Report & Recommendation* should be adopted in its entirety.

**Argument**

**I.       Defendants' Criticisms of the Court's *Report and Recommendation* are Directly Contrary to the Procedural, Evidentiary and Substantive Standards Fundamental to the Disposition of any Motion for Summary Judgment.**

The defendants' central theme in their objections is the criticism that the Court "impermissibly weighed conflicting evidence" and  "discounted evidence" calling Justin's suicidal intent into question, thereby usurping the role of the jury and "act[ing] as the finder of fact" in granting North American's motion. The problem with this contention is two-fold.

First, defendants chastise the Court for conducting precisely the rigorous review and analysis of the record "taken as a whole" and "in its totality" that is mandated by the trilogy of Supreme Court decisions in *Matsushita*, *Anderson*, and *Celotex*, which dramatically reshaped summary judgment methodology. While defendants contend various isolated facts and inferences

identified in their objections – standing alone – require a jury trial, their proposal for the Court to consider each fact "in isolation" is directly contrary to the district courts' mandate to review the "totality" of the evidence "taken as a whole" to decide "whether [the evidence] is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

In so doing, the Court is not improperly acting as a "trier of fact," but is merely discharging its gatekeeper function under Fed. R. Civ. P. 56. *Accord Carrizosa v. Chiquita Brands Int'l, Inc*., 47 F.4th 1278, 1328-29 (11th Cir. 2022); *Cotton ex rel. Boynton v. Prudential Ins. Co. of Am.,* No. 3:05CV46-RS, 2006 WL 212016, at *3 (N.D. Fla. Jan. 27, 2006) (must review "record taken as a whole" to determine "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"). The defendants' objections, in short, require tearing the Supreme Court's 1986 trilogy of summary judgment decisions out of the *U.S. Reports*.

Second, and equally problematic, the defendants' criticisms of the Court's application of the substantive principles of Florida law to the undisputed evidentiary record fail to acknowledge or address even one of the pivotal Florida Supreme Court, Florida intermediate court, or Eleventh Circuit decisions establishing the definition, elements and contours of "suicide."

When these principles of Florida substantive law are applied to the undisputed facts, employing the summary judgment methodology mandated by the Supreme Court, the Court's conclusions are inescapable.  Because the undisputed evidence demonstrates Justin committed multiple voluntary acts in furtherance of his repeatedly stated intent to end his life by provoking the police into shooting and killing him, resulting in his death, the Court correctly (and inevitably) concluded that no reasonable jury could conclude otherwise.

### A. Defendants Ignore Watershed Precedent from the United States Supreme Court Demanding that District Courts Scrutinize the "Record as a Whole" and Consider the Undisputed Facts in their "Totality."

The central flaw in defendants' objections to the *Report & Recommendation* can be encapsulated in the oft-repeated admonition against "failing to see the forest for the trees," contrary to established summary judgment methodology. While defendants recite various, discrete items of evidence to speculate why Justin may not have intended to end his life that morning, the Court held in *Matsushita* that the district courts must review the "record taken as a whole" when resolving summary judgment motions. 475 U.S. at 587. While a fact considered "in isolation" might be cited to support a non-movant's position, the Court held, the analysis of the sufficiency of a challenged claim or defense must be "evaluated in its factual context." *Id*. The Court's holding applies equally to competing inferences from the facts, which likewise must be considered within the context of the "record as a whole." *Id*. at 588. Indeed, in *Carrizosa*, the Eleventh Circuit criticized a district court that had "considered some of the plaintiffs' evidence 'standing alone,'" admonishing that the "courts are required to consider 'the totality of the evidence adduced in [the] summary judgment record.'" 47 F.4th at 1329.

In *Anderson*, moreover, the Court observed that under the old, discarded summary judgment methodology, "if there was what is called a *scintilla* of evidence in support of a case the judge was bound to leave it to the jury." 477 U.S. at 251. However, the Court held that henceforth, "in every case, before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is *literally* <u>no evidence</u>, but whether there is any upon which a jury could *properly* proceed to find a verdict" for the non-movant. *Id*. *Accord May v. Pritchett,* No. 22-10147, 2022 WL 16753599, at *3 (11th Cir. Nov. 8, 2022).

There will always be some discrete facts that can be cited to support or oppose a proposition; however, the record "taken as a whole" must be such that a "reasonable jury could

return a verdict for the nonmoving party," as opposed to relying upon evidence that is "merely colorable" and "not significantly probative." *Anderson*, 477 U.S. at 248-49. Nor can a mere "metaphysical doubt" overcome a *prima facie* case for summary judgment. *Matsushita*, 475 U.S. at 587.  Instead, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson,* 477 U.S. at 252.

Finally, because triable issues are not premised on "'speculation and conjecture that [would] render [the jury's] finding a guess or mere possibility,'" *Carrizosa*, 47 F.4th at 1336, "inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion," *Poer v. Jefferson Cnty. Comm'n*, No. 22-11401, 2024 WL 1904568, at *6-7 (11th Cir. 2024), nor can "suspicion, perception, opinion, and belief" prevent the entry of summary judgment. *LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999).

Based on proper summary judgment methodology applying established Florida substantive law to the evidentiary record, the defendants' objections are without merit.

### B.  Defendants' Objections to the *Report & Recommendation* Fail to Acknowledge – Much Less Address – the Principles of Florida Law Controlling the Disposition of the Motion for Summary Judgment.

Since a fact is "material" under Fed. R. Civ. P. 56 only if it "goes to a legal element of the claim under the applicable substantive law," *Anderson*, 477 U.S. at 248; *Goggans v. Target Corp.,* No. 21-10971, 2021 WL 5298900, at *1 (11th Cir. Nov. 15, 2021), it follows that any valid critique of the Court's *Report & Recommendation* must be rooted in the consideration of Florida state law governing suicide.  However, defendants have ignored – quite literally – each of the Florida precedents and principles governing the disposition of North American's motion.

First, defendants fail to acknowledge (either in their objections or in their summary judgment briefing) the Eleventh Circuit's holding that the three elements of suicide are "[1] a

person's intent to die, [2] his voluntary act on that intent, and [3] his resultant death." *Caldwell*, 55 Fed. 4th at 870.  The Court's *Report & Recommendation* is specifically rooted in this holding, of course, correctly concluding that [1] Justin's own words and actions demonstrated his intent to end his life that day; [2] Justin committed multiple voluntary acts in furtherance of that intent; and [3] regardless of speculation that Justin "may have" hesitated during his confrontation of the SWAT team or that he "may have" thought he was acting in "self-defense," Justin's voluntary actions in furtherance of his intent to end his life led inexorably to his "resultant death."  ECF No. 108 at pp. 10, 14-15.

Second, defendants fail to acknowledge the pivotal decisions in *Krischer v. McIver,* 697 So. 2d 97, 102–04 (Fla. 1997), *Singletary v. Costello*, 665 So. 2d 1099, 1106 (Fla. 4th DCA 1996), and *Satz v. Perlmutter*, 362 So. 2d 160, 162–63 (Fla. 4th DCA 1978), *approved*, 379 So. 2d 359 (Fla. 1980) confirming that a person who sets in motion a "death-producing agent" with the intent and result of ending his life commits suicide. The Court correctly relied on this second line of Florida decisions as well to conclude that on October 8, 2020, Justin indisputably had initiated an "unbroken chain of events" that resulted in his death. ECF No. 108, pp. 14-15.

Third, defendants fail to acknowledge *Charney v. Illinois Mut. Life Ins. Co.,* 764 F.2d 1441 (11th Cir. 1985), *Yonkers v. Riversource Life Ins. Co*., No. 10-80415-CIV, 2011 WL 332830 (SD Fla. Jan. 31, 2011), or *C.M. Life Ins. Co. v. Ortega Through Ortega*, 562 So.2d 702 (Fla. 3d DCA 1990)*,* each confirming that the courts must grant summary judgment where the individual facts and inferences proffered by the non-movant do not overcome "overwhelming" evidence of suicide so "one-sided" that no reasonable jury could conclude otherwise.

Fourth, defendants fail to address any of the 29 additional decisions cited by North American (and the cases cited within those decisions) ruling, as a matter of law, that the insureds

had committed suicide.  Underscoring the critical importance of conducting a rigorous review of the record in its totality at the summary judgment stage, in 15 of these 29 decisions, the appellate courts were compelled to reverse summary judgment rulings, refusals to grant directed verdicts, or jury verdicts, because the record supported no *reasonable* conclusion other than suicide.[1]

Importantly, the courts ruled that these deaths were suicides notwithstanding conflicting evidence, competing inferences, and alternative theories advanced by the beneficiaries.  Because courts must evaluate such conflicting evidence, competing inferences, and alternative theories within the context of the evidentiary record "taken as a whole," the mere existence of such conflicting evidence was no valid obstacle to summary judgment where the evidence was "so one-sided that one party must prevail as a matter of law."  *Anderson*, 477 U.S. at 251-52.

Six of these 29 decisions were issued by the Florida state and federal courts.  *See C.M. Life Ins. Co.*, 562 So.2d at 703-704 (reversal of bench trial ruling and concluding suicide clause precluded coverage for death while playing "Russian Roulette" because the "conflicting testimony" and alternative theories could not "overcome the preponderance of evidence of suicide," and holding the death was "the result of a conscious decision to play a game with death" and was a "reasonable and probable consequence of his volitional act"); *Yonkers*, 2011 WL 332830, at *1, 1 n. 2, 3-4 (entering summary judgment concluding death by gunshot was suicide, rejecting as "speculation" the proffered inference that the gunshot was not self-inflicted, and rejecting speculation that the insured had "killed himself in a suicidal gesture" to garner sympathy, and also rejecting as irrelevant the suggestion that anti-depressants may have impaired

---

[1] The standard governing summary judgment and directed verdicts is identical.  *See Doe v. Drummond Co.*, 782 F.3d 576, 604 (11th Cir. 2015) ("The non-movant will survive summary judgment in this instance if it can demonstrate 'that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion.'").

the insured's judgment); *Charney,* 764 F.2d at 1442-43 (reversal of summary judgment and holding that coverage for death by ingesting lethal drugs was precluded by the suicide exclusion notwithstanding the suggestion that anti-depressants had impaired the insured's judgment); *New Horizons Telecasting Corp. v. Professional Ins. Corp.,* 200 So.2d 835, 836 (Fla. 1st DCA 1967) (affirming ruling that suicide clause precluded coverage for death by gunshot because a "fanciful, speculative or unreasonable hypothesis of causes other than suicide" cannot overcome "evidence [that] unerringly points to but one reasonable hypothesis – suicide"); *World Ins. Co. v. Kincaid*, 145 So.2d 268, 272 (Fla. 3rd DCA 1962) (reversing denial of motion for directed verdict and holding suicide as a matter of law based on the "overwhelming weight of the positive testimony … producing the inescapable conclusion of death by suicide"); and *Anderson v. New York Life Ins. Co*., 140 Fla. 198, 199 (1939) (affirming death was a suicide (rather than accidental) as a matter of law).

Further supporting the Court's *Report & Recommendation* – and again, left unaddressed by the defendants – are the other 23 decisions from across the country concluding as a matter of law that the deaths were suicide after considering conflicting, but insufficiently probative, testimony, evidence, and inferences proffered by the beneficiaries (12 of the 23 reversing the lower courts' decisions).[2]  Despite the cumbersome length of this list of decisions, North

---

[2] These 23 extrajurisdictional decisions include *McCorkle v. Metro. Life Ins. Co.,* 757 F.3d 452, 458 (5th Cir. 2014) (reversal of summary judgment holding that coverage for death by "Russian Roulette" was precluded by the suicide exclusion after considering conflicting but insufficient evidence advanced by beneficiary); *Moats v. Life Ins. Co. of North America*, 162 F.3d 1162, 1998 WL 553159, at *3 (6th Cir. 1998) (affirms summary judgment and holds that "where the reasonable probabilities from all the evidence, in the light of reason and common sense, all point to suicide, and are inconsistent with any other theory, the court should not leave the issue of suicide to the jury"); *Byun v. New York Life Ins. Co.,* 111 F.3d 137, 1997 WL 196741, at *1 (9th Cir. 1997) (rejecting evidentiary inferences of foul play "in light of the overwhelming physical evidence" that the death was a suicide where "the record taken as a

whole could not lead a rational jury to find for the non-moving party"); *Arnold v. Metro. Life Ins. Co.,* 970 F.2d 360, 361 (7th Cir. 1992) (affirming "Russian Roulette" summary judgment ruling of suicide as a matter of law because the "death from Russian Roulette was reasonably foreseeable, and thus not accidental" and rejecting speculation that insured had only been trying "to intimidate his girlfriend into acting as he wished"); *Boswell v. Gulf Life Ins. Co.,* 227 F.2d 578, 581 (5ᵗʰ Cir. 1955) (affirming directed verdict of suicide by carbon monoxide because the "record taken as a whole, and in the light most favorable to [beneficiary] permits but the single inference that the deceased took his own life"); *Von Crome v. Travelers Ins. Co.,* 11 F.2d 350, 352-53 (8ᵗʰ Cir. 1926) (holding that based on a review of the totality of the evidence the "conclusion of suicide [was] inevitable as a matter of law"); *New York Life Ins. Co. v. Weaver,* 8 F.2d 680, 682 (5th 1925) (reversing verdict and finding suicide exclusion barred coverage as a matter of law where "the uncontroverted evidence in the instant case so convincingly showed that the insured's death was caused by carbolic acid taken by him for the purpose of self-destruction that a finding that his death was caused otherwise than by himself was not warranted"); *New York Life Ins. Co. v. Bradshaw,* 2 F.2d 457, 458 (5th Cir. 1924) (reversing verdict and applying suicide exclusion as a matter of law where "hypothesis of accidental death is inconsistent with facts established by uncontroverted evidence" and that alternative theory of death was "not reasonably conceivable")*; Wightman v. Securian Life Ins. Co.,* 453 F. Supp. 3d 460, 463, 468–69 (D. Mass. 2020) (granting summary judgment precluding coverage based on suicide clause and explaining that Russian Roulette death is suicide because "'[o]ne who purposefully creates the conditions of risk foresees the logical consequence of risk, and has to assume that he may not be able to manage those conditions so as to eliminate the risk he has created'")*; Freeman v. Securian Life Ins. Co.,* No. 5:17-CV-540-DAE, 2018 WL 6588580, at *6-7 (W.D. Tex. Nov. 20, 2018) (summary judgment holding that insurer had properly concluded that coverage for "Russian Roulette" death was excluded by the suicide clause); *Mott v. Sovereign Camp,* 244 S.W. 733, 733-34 (Ark. 1922) (affirming suicide as a matter of law and rejecting speculative evidentiary inferences advanced in favor of alternative theories of murder or accidental death, holding "a case was not made for a jury, as the only reasonable inference to be drawn from the testimony is that he killed himself"); *New York Life Ins. Co. v. Watters,* 243 S.W. 831, 832 (Ark. 1922) (reverses trial court and concludes suicide as a matter of law notwithstanding competing evidentiary inferences advanced by beneficiary that were "overcome by the undisputed facts and circumstances")*; Thompson v. Prudential Ins. Co. of America,* 66 S.E.2d 119, 123 (1951) (cited with approval in *C.M. Life Ins. Co.*, holding suicide as a matter of law because "Russian Roulette" death "is no less intentional than had the gun been fully loaded and his death or injury cannot be said to have been the result of accident or effected by accidental means," because "it will be presumed that the participant intended that he should be killed or injured"); *Pilot Life Ins. Co. v. Wise,* 173 S.E. 252, 253-54 (Ga. App. 1934) (reversing verdict and holding suicide as a matter of law, rejecting speculative theory of accidental death considered in the context of the insured's multiple suicidal statements, and observing that "it is not an easy thing for us to feel impelled, as we have felt, to adjudicate the fact of suicide"); *Gavin v. Des Moines Life Ins. Co.,* 126 N.W. 906, 908 (Iowa 1910) (reversing jury verdict and finding suicide as a matter of law, noting among

American has presented these multiple citations and encapsulations of their holdings to underscore the rigorous analysis of the evidentiary record undertaken by these courts to ascertain whether the (inevitable) conflicting testimony and evidence proffered by the non-movant was sufficiently probative to overcome the "overwhelming evidence" of suicide.

---

the other overwhelming evidence that the surviving spouse herself had "expressed her belief that her son had committed suicide"); *Green v. New York Life Ins. Co.*, 182 N.W. 808, 812 (Iowa 1921), *overruled on other grounds, Bill v. Farm Bur. Life Ins. Co.*, 2119 N.W.2d 768 (1963) (reversing jury verdict where "all the facts and circumstances surrounding the case, as shown by the record, lead clearly and convincingly to the irresistible conclusion that the insured committed suicide" and thus "it was the duty of the trial court to direct the jury to return a verdict")*, Eckendorff v. Mut. Life Ins. Co. of New York*, 97 So. 394, 397 (La. 1923) (reversing verdict and finding suicide as a matter of law after considering competing evidentiary inferences advanced in support of murder or accident as the cause of death, because "we cannot reasonably escape the conclusion that [the insured], because of the motive assigned, lay down in bed and intentionally took his own life")*; Fletcher v. Sovereign Camp Woodmen of the World*, 32 So. 923, 924 (Miss. 1902) (reversing verdict and holding suicide as a matter of law after considering conflicting (though insufficiently probative) evidence proffered by the beneficiary because "the evidence in this case is so clear and convincing that [the insured] did commit suicide")*; Skala v. New York Life Ins. Co.*, 172 P. 1046, 1047 (N.M. 1918) (reversing verdict and finding suicide as a matter of law despite conflicting (though insufficiently probative) evidence because a "careful examination of all of the evidence contained in the record makes irresistible the conclusion that the insured committed suicide")*; Foster v. Globe Life & Acc. Ins. Co.*, 808 F. Supp. 1281, 1286 (N.D. Miss.) (relying on *Charney* and granting summary judgment where the "evidence overwhelmingly demonstrates that [the insured] committed suicide" and holding that the "somewhat inventive [] alternative scenarios plaintiff paints to explain her husband's death are nothing more than pure speculation and imagination, bordering on sheer fantasy with no probative force"); *Koger v. Mut. of Omaha Ins. Co.,* 163 S.E.2d 672, 676-77 (Va. 1968) (cited by *C.M. Life Ins. Co.* with approval, reversing jury verdict for beneficiary and finding suicide as a matter of law even if it were concluded that the insured had been engaged in the "precarious and ridiculous 'game' of Russian Roulette"); *Agen v. Metropolitan Life Ins. Co.*, 80 N.W. 1020, 1021-23 (Wis. 1899) (reversing verdict and holding suicide as a matter of law); *Voelkel v. Supreme Tent of Knights of Maccabees of the World*, 92 N.W. 1104, 1105 (Wis. 1903) (affirming suicide as a matter of law despite competing evidence and theories advanced because there was  no "single fact in the case that suggests any other cause of death than suicide" when considered within the context of the "accompanying circumstances")*.*

In *Von Crome*, the Eighth Circuit observed that if courts did *not* rigorously separate the wheat of overwhelming evidence of suicide from the chaff of "speculative," "merely colorable," or "insufficiently probative" evidence, virtually *every* suicide case would go to a jury:

> [I]f this contention were the law, no case heretofore could ever have been taken from the jury, on the ground that the uncontradicted evidence showed suicide conclusively, for the very simple reason that the presumption itself would carry the case to the jury. Yet this has many times been done, and the books are full of cases wherein the courts held that suicide was shown as a matter of law.

11 F.2d at 352 (relying upon thirteen decisions finding suicide as a matter of law). The Wisconsin Supreme Court underscored the importance of the courts' gate-keeper role and the mischief frequently resulting from failing to conduct the type of rigorous analysis reflected in the Court's *Report & Recommendation* here:

> We are not unmindful of the fact that there are numerous adjudications in cases of this kind where there is reason to say that courts have allowed a finding to be made by a jury and to stand on mere conjecture in regard to death having been produced by some other circumstance than that of suicide, seemingly overlooking the salutary rule that there is a limit beyond which a jury cannot go – the line of reasonable probability – and that such rule is as inflexible as any in our jurisprudence.

*Agen*, 80 N.W. at 1023.

As the Court reminded the courts in *Celotex*, the proper application of summary judgment methodology under Rule 56 is not only intended to protect the rights of persons pressing claims, "but also [] the rights of persons *opposing* such claims … to demonstrate in the manner provided by the Rule, *prior to trial*, that the claims … have no factual basis." 477 U.S. at 327.  Consistent with this important principle, the Magistrate properly discharged its obligations here.

**II.    The Court Correctly Concluded that the Competing Evidence, Inferences, and "Inventive Alternative Scenarios" Posited by the Defendants to Resist Summary Judgment Do Not Overcome the Weight of the Overwhelming, Undisputed Evidence Demonstrating that Justin's Death was a Suicide.**

Upon a review of the evidentiary record "taken as a whole," it is readily apparent the Court discharged its duty on summary judgment to "'see the forest through the trees,'" *Lewis v.*

11

*City of Union City*, 918 F.3d 1213, 1240 n. 10 (11th Cir. 2019), correctly holding that the only conclusion a reasonable jury could reach based on this evidentiary record is that Justin's death was a suicide.  The Court premised its decision upon the following, *non-exhaustive* enumeration of undisputed facts demonstrating Justin's stated intent to end his life; his voluntary acts in furtherance of that intent; and his "resultant death," *i.e.,* demonstrating that Justin's death indisputably was a suicide under established principles of Florida law:

1)  Justin told his wife and young daughter the morning of his death that he intended to force the police to shoot and kill him that day (*Report & Recommendation*, pp. 4-5, ¶¶ 4, 5, 6, 8, and 9).

2)  Justin sent text messages and emails to his wife and mother that morning saying, you "finally got rid of me," and you will be "stuck here" while I am going "someplace better," as his deceased grandmother had told him in a dream (*id*., p. 5, ¶ 10).

3)  Justin told a police hostage negotiator that he would be "coming down the driveway with my rifle because I'm not a f*cking pantywaist," and "you guys decide what you want to do, but you better understand my background and that I'm not your usual pantywaist American;" (*id*., p. 7, ¶ 14).

4)  Justin then emerged from his garage brandishing a high-powered loaded rifle, waving it in the air, and screaming at the heavily-armed SWAT team, "Why don't you kill me?  Why don't you f*cking kill me?" and "I know what you guys are here to do, take the shot!" (*id*., p. 8, ¶¶ 15-16).

5)  After laying his rifle on the bed of his truck in the driveway, Justin responded to SWAT team instructions to surrender and to "just come over here and talk to us," by screaming, "F*ck that," then turned around and walked away from the SWAT team (*id*., p. 8, ¶¶ 17-19).

6)  After shooting a foam projectile at Justin to try to stop him from retrieving his rifle, Justin bolted towards his truck and his rifle "at a very rapid pace" (*id*., pp. 8-9, ¶ 20).

7)  In response, the SWAT team left their protective cover and rushed to reach Justin before he could get back to his rifle, yelling for him to stop (*id*., p. 9, ¶ 21).

8)  Justin got to his truck before the SWAT team could reach him, grabbed his rifle, swung it around, and pointed its barrel directly at one of the officers "in a shooting position" (*id*., ¶ 21).

9)      The targeted officer fired his weapon at Justin, striking him with multiple rounds (*id*., ¶ 22).

10)     Justin died as a result of this lethal fire (*id*., ¶ 23).

Throughout this encounter, it is undisputed Justin refused to comply with repeated commands by the SWAT team to lie down in the driveway and surrender himself. SMF, ¶ 27.  It is also undisputed Justin could have ended his confrontation of the SWAT team at any time, simply by surrendering, if he had *not* intended to end his life that morning:

> **Q**.     At any time … did [Justin] comply with those basic instructions of your officers to simply end all of this by laying down on the ground and letting you take him into custody?
>
> **A**.     No.
>
> ***
>
> **Q**.     And at any time, this chain of events could've been ended by Justin Caldwell if he had only surrendered to you and your officers peacefully, true?
>
> **A**.     Correct.

SMF, ¶ 33; Collazo Dep. at 57-59.

In response to these undisputed facts, defendants advance four arguments to resist summary judgment.  However, none of the proffered facts or alternative theories overcome the "totality of evidence" establishing that Justin's death was a suicide, particularly when reviewing the "record taken as a whole," *Carrizosa*, 47 F.4th at 1329, instead of considering discrete facts in isolation as the defendants advocate in their objections.  *See, e.g.,* ECF 81, p. 6 (asserting that "this one piece of evidence alone … directly refutes" that Justin committed suicide).

First, defendants argue that the Court improperly "discounted" Justin's purported "statements to the police that he was not suicidal" during his phone call with the hostage

negotiator prior to his emergence from the garage.[3]  As recounted in the *Report & Recommendation*, however, although Justin *initially* told the hostage negotiator that he was only planning to pack up his weapons and belongings and leave, moments later during this same recorded call, he told her that he was "coming outside with his rifle." DE 71-7 at 11. When the officer told him that she would be more comfortable if he left his weapons in his garage, Justin responded, "I don't give a f*ck what you people think about comfortable.  I'm coming outside with a real man's rifle."  *Id.* Justin repeated his threat again, moments later.  *Id.* at 13-14.

More importantly, Justin made good on his threats, emerging from his garage minutes later, waving his loaded rifle and screaming at the police to shoot and kill him.  *Report & Recommendation*, p. 8, ¶¶ 15-6.  It is difficult to imagine a better example of a non-movant putting forward a fact "in isolation" in an effort to resist summary judgment without considering the context of such proffered evidence within the "record taken as a whole."

Second, defendants reprise their summary judgment contention that Justin might not have been "serious" when he told his wife and young child that he planned to force the police to shoot and kill him, and when he screamed at the SWAT team to "f*cking shoot me" and "f*cking kill me." ECF 81 at p. 3. The defendants contend that a "reasonable jury" might conclude that these disturbing demands to be shot and killed were made "in jest," or that Justin was just "hurling insults" at the police to express "his political views on police violence," and that Justin "was not legitimately trying to get them to shoot him …."  *Id.* at p. 8.  *See* ECF No. 111 at 5 (Justin may

---

[3] Contrary to the defendants' repeated characterization of the record, ECF No. 111 at pp. 4, 6, and 9, Justin *never* told the police that he was "not suicidal."  *See* DE 71-7.  However, these misstatements of Justin's actual statements to the police during the call are immaterial to the disposition of the motion or the Court's conclusions in its *Report & Recommendation*.

have screamed at the police to "f*cking kill me" in a "derisive manner" to protest that "police are irresponsible in their use of lethal force").

Rank speculation cannot overcome any *prima facie* case for summary judgment, much less overcome the overwhelming evidence of Justin's suicidal statements and actions demonstrated in this record.  *See Carizosa*, 47 F.4th  at 1336 (rejecting arguments based on "speculation and conjecture that [would render a jury's] finding a guess or mere possibility"); *Yonkers,* 2011 WL 332830, at *1 n. 2 (holding that the "court rejects [beneficiary's] argument as speculation" and concluding that the insured's death was suicide as a matter of law); *Kincaid*, 145 So.2d at 277 (rejecting alternative theories to suicide "fraught with inference upon inference drawn from pure speculation and conjecture" where the "overwhelming weight of the competent material evidence in the cases on appeal, taken as a whole, affords no basis for any conclusion other than that the insured committed suicide"); and *C.M. Life Ins. Co.,* 562 So.2d at 704 (holding that beneficiary's alternative theories were "contrary to the weight of the evidence and represented a speculative hypothesis and as such could not be employed to overcome the evidence of suicide").

Justin told his wife, his daughter, and the SWAT team that he wanted the cops to shoot and kill him, and he then engaged in a dangerous course of conduct that forced the police to do so.  The defendants' suggestion that Justin's death was just a big misunderstanding is precisely the type of "fanciful, speculative [and] unreasonable hypothesis" that defies "reason and common sense," and that cannot overcome overwhelming evidence that "unerringly points to but one reasonable hypothesis – suicide." *New Horizons,* 200 So.2d at 836.  *Accord Foster,* 808 F. Supp. at 1286 (citing the Eleventh Circuit's decision in *Charney*, holding suicide as a matter of law, and rejecting the "inventive [] alternative scenarios [the beneficiary] paints to explain her

husband's death" as "pure speculation and imagination, bordering on sheer fantasy with no probative force").[4]

Third, defendants argue that Justin's resting his rifle on the bed of his truck (though still screaming at the officers to shoot and kill him) somehow negates the overwhelming and undisputed evidence of Justin's immediately preceding and subsequent words and actions demonstrating his suicidal intent. As the Court concluded in its *Report & Recommendation*, the defendants' argument ignores that Justin *never* complied with the SWAT team's repeated demands for him to surrender himself, which would have brought the chain of events he had set in motion to a swift and safe conclusion. *Report & Recommendation*, ECF 108, p. 11. As Officer Collazo testified, "at any time, this chain of events could've been ended by Justin Caldwell if he had only surrendered to [Officer Collazo] and his fellow officers peacefully." SMF, ¶ 33.

As the Court observed, *after* Justin had placed his rifle on the bed of his truck, he *continued* his course of conduct in furtherance of his stated plan to end his life, first, by cursing at the officers and abruptly turning and heading back in the direction of his truck and rifle; and second, by bolting to his truck to retrieve his rifle after being struck by the foam projectile. Justin ignored the commands of the SWAT team for him to stop, racing to his truck, grabbing his

---

[4] The defendants also contend that deposition testimony by two of the officers that they did not believe at the time that Justin was trying to commit suicide-by-cop somehow provides a basis for rejecting the Court's *Report & Recommendation*. ECF No. 111 at p. 5. There are three problems with this argument. First, the testimony quoted by defendants was in response to queries directed to the assessment of Justin's conduct *at a particular point* during the confrontation; not a single officer testified that he emerged from the events of October 8, 2020 believing Justin had not intended to commit suicide-by-cop. Second, only some (but not all) members of the SWAT team had been made aware that morning that Justin just had told his wife and child he planned to force the police to shoot and kill him (evidence that *is* available to this Court). And third, such a subjective belief formed by the police (especially formed during the course of events while responding to a lethal confrontation) is not admissible evidence of Justin's state of mind. *LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) (someone's subjective "belief" is not admissible evidence to resist summary judgment). The SWAT team was busy trying to protect their own lives, the lives of their fellow officers, and the lives of innocent neighbors and bystanders; they were not conducting an impromptu psychological assessment of Justin in the field.

rifle, swinging it around, and pointing its barrel in the face of one of the approaching SWAT team members, who was forced to respond with lethal fire. ECF 108, p. 11.

Further, the Court correctly applied Florida law defining suicide as setting in motion a "death-producing agent" with the intent and result of ending one's life. ECF 108, p. 15 (citing *Singletary v. Costello*, 665 So. 2d at 1106).  *Accord  Krischer,* 697 So. 2d at 102–04; and *Satz,* 362 So. 2d at 162–63.  The Court also properly invoked the Eleventh Circuit's holding in this action identifying the three elements of suicide as "[1] a person's intent to die, [2] his voluntary act on that intent, and [3] his resultant death." *Caldwell*, 55 Fed. 4th at 870.

Regardless of defendants' speculation that Justin may have wavered in his intentions at some point during his confrontation of the SWAT team (a dubious proposition, as Justin never chose to end the confrontation by simply lying on the ground and surrendering), this Florida and Eleventh Circuit precedent renders any such speculation irrelevant.  As the Court correctly concluded, Justin's "death resulted from an unbroken chain of events flowing from his decision to confront the SWAT team," ECF No. 108, p. 15, setting in motion a "death-producing agent" in pursuit of his repeatedly stated intention to end his life, indisputably causing his death. *Id*.

Finally, although unnecessary to the disposition of this motion, the Court also properly invoked multiple secondary authorities and case law expressly holding (consistent with the principles enunciated in *Caldwell*, *Singletary, Krischer,* and *Satz*) that "'even if there were facts which unequivocally indicated a last-minute change of heart, those facts would actually be irrelevant" because Justin was "responsible for deliberately creating the circumstances which ultimately brought about his death…The relevant issue is that his death resulted from his original intention to kill himself.'" ECF No. 108, p. 14 (quoting *Chepke v. Lutheran Bhd*., 660 N.E.2d 477, 478 (Ohio App. 1995), and citing *Estate of Tedrow v. Standard Life Ins. Co. of Indiana*, 558

N.W.2d 195, 198 (Iowa 1997), 9A Couch on Ins. § 138:54, and 46 C.J.S. Ins. § 1692 for the identical proposition).

Persons who meet their deaths despite crawling from a car during carbon monoxide poisoning; despite struggling to loosen a noose; despite applying a tourniquet to a bleeding appendage; or despite calling 911 after ingesting a bottle of pills, indisputably have committed suicide despite their change of heart.  So too, the Court correctly concluded, Justin's death still was a suicide *despite* any speculation that he may have wavered or changed his mind during the course of events precipitated by the "death-producing agent" he deliberately set into motion that morning.  ECF No. 108, pp. 14-15.

While defendants attempt to distinguish these authorities by arguing that someone attempting suicide by carbon monoxide poisoning has "initiated the suicidal act" and thus "took the leap" to commit suicide, such statements apply with equal force to Justin.  Justin, too, "initiated the suicidal act" and "took the leap" to commit suicide when he emerged from his garage waving a rifle and screaming at the heavily-armed members of the SWAT team to shoot and kill him.  As the Eleventh Circuit held in this action, the elements of suicide do not vary depending on the person's chosen *method* of committing suicide, because the "method is irrelevant."  *Caldwell*, 55 F. 4th at 870. Everything that happened after Justin set the "death-producing agent" in motion that morning – including in his death – was a direct result of Justin's own decision and his own actions.  These facts are not just overwhelming – they are undisputed.

Fourth, defendants speculate Justin may have thought he was acting in justifiable "self-defense" after being struck by the foam projectile intended to prevent him from retrieving his rifle.  Such speculation, again, cannot overcome a *prima facie* case for summary judgment, nor does such conjecture alter the undisputed facts that *Justin* deliberately set in motion the "death-

producing agent" that resulted in his death; and that *Justin* could have terminated the chain of events he had set in motion by simply lying down and surrendering himself. Thus, Justin's death was a suicide, notwithstanding any delusions of "self-defense" posited by the defendants.

The undisputed facts demonstrate that Justin plainly and repeatedly stated his intent to end his life that morning (satisfying the first *Caldwell* element); that Justin committed multiple voluntary acts in furtherance of his stated intent (satisfying the second element); and that Justin's conduct inexorably resulted in his death (satisfying the third element). There is no basis to challenge the Court's *Report & Recommendation*.

### III.   The Court was not "Confused" by the Concepts of an Accidental and Unintended Death Versus an Intentional Death by Suicide and Properly Invoked the "Russian Roulette" Analogy Rooted in the *C.M. Life* Decision.

The defendants' final argument in support of their objections to the *Report & Recommendation* is that the Court erroneously relied upon the decisions holding that an insured's death as a result of playing "Russian Roulette" is an intentional act of suicide rather than an accident. The defendants contend these "Russian Roulette" decisions are inapposite because they focus on the (supposedly inapplicable) element of foreseeability, and because "[a]ll of the Russian Roulette cases" were deciding what constitutes an "accident" in "accidental death" policies, rather than interpreting and applying the suicide clause. The defendants are mistaken on *all* counts.

Contrary to the assertion that the "foreseeability" element driving the analyses in the "Russian Roulette" cases is irrelevant to determining whether someone's death is a suicide, the Eleventh Circuit relied on *precisely* this principle in reaching its holding, specifically equating the "predictable and lethal response" of law enforcement threatened by an insured committing suicide-by-cop with the "predictable and lethal outcome" of an insured hurling himself into the path of an oncoming train. *Caldwell*, 55 F.4th at 871 (cited at ECF No. 108 at 13). Likewise, in

*C.M. Life* – a "Russian Roulette" decision specifically holding that *the suicide clause* precluded coverage – the court invoked the concept of foreseeability, holding that the death was "the result of a *conscious decision* to play a game with death." 562 So.2d at 703-704. Because the  insured's death was the "*reasonable and probable consequence* of his volitional act," the Court concluded he had acted with the requisite intent to end his life, rendering his death a suicide. *Id*.

Holding a loaded pistol to one's head and pulling the trigger (however many chambers are empty) is suicidal because the individual is acutely aware of the potential lethal consequences of such conduct – just as Justin's belligerent confrontation of the heavily-armed SWAT team was suicidal.  While not essential to the conclusion that Justin's death was suicide, the Court properly invoked *C.M. Life,* nor was the Court "confused" in relying upon the principle of foreseeability.

## Conclusion

Based on the points and authorities set forth in this brief and in plaintiff's briefing in support of summary judgment, North American respectfully requests that the Magistrate's *Report & Recommendation* be adopted by this Court in its entirety.

Dated this 20th day of May, 2024.

By: /s/ *Paul F. Heaton*
    Brett J. Preston (FBN: 603716)
    brett.preston@hwhlaw.com
    HILL, WARD & HENDERSON, P.A.
    101 East Kennedy Blvd., Suite 3700
    Post Office Box 2231
    Tampa, Florida 33601
    (813) 221-3900 (Telephone)
    (813) 221-2900 (Facsimile)

    Paul F. Heaton (*pro hac vice*)
    WI Bar No. 1000858
    Nicholas Bezier (*pro hac vice*)
    WI Bar No. 1101618
    pheaton@gklaw.com
    nbezier@gklaw.com
    GODFREY & KAHN, S.C.
    833 East Michigan Street, Suite 1800
    Milwaukee, WI 53202-5615
    (414) 273-3500 (Telephone)
    (414) 273-5198 (Facsimile)

    *Attorneys for Plaintiff North American Company*
    *for Life and Health Insurance*

31231025.1

[1]